**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**CASE NO. _____**

| | |
|---|---|
| MAGDALENA BOJKO and COURTNEY HEEREN, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| vs. | ) ) |
| PIERRE FABRE USA INC., | ) ) |
| Defendant. | ) ) |
| _____ | ) |

CLASS ACTION

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiffs Magdalena Bojko and Courtney Heeren (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Pierre Fabre USA Inc. ("Defendant") and allege, based upon personal knowledge as to Plaintiffs and Plaintiffs' acts, and on information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, as follows:

**NATURE OF THE ACTION**

1.       This is a class action lawsuit by Plaintiffs, and others similarly situated, who purchased for normal household use Defendant's dry shampoo products that are defective because they contain benzene, and which were formulated, designed, manufactured, marketed, advertised, distributed, and sold by Defendant.

2.       Defendant distributes, markets, and sells to consumers across the United States, both in retail establishments and online, including in Illinois, certain dry shampoo products under

the "Klorane" brand (the "Products"[1]). Upon information and belief, the Products are adulterated and/or contaminated with benzene, a known human carcinogen.

3.      Plaintiffs and putative Class members each purchased, and they or their household members used, Defendant's Products—the same brand that was specifically identified by an independent testing agency as exceeding the U.S. Food and Drug Administration's ("FDA") permissible levels of benzene in cosmetics.[2]

4.      The Products are defective because they contain significant amounts of the chemical benzene, a known human carcinogen; yet despite the presence of benzene, Defendant represents that the Products are safe and effective for their intended use.

5.      The presence of benzene in Defendant's Products was not disclosed to consumers in the Products' labeling, advertising or otherwise, in violation of state and federal law. Plaintiffs and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and seek injunctive relief and restitution for the full purchase price of the Products. Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1] The Products include the following Klorane Dry Shampoo varieties: Dry Shampoo with Nettle and Dry Shampoo with Oat Milk. However, as alleged herein, Defendant conceals the presence of benzene in the Products; thus, discovery will reveal all of the substantially similar products included in this action.
[2] *See* Valisure Citizen Petition on Benzene in Dry Shampoo Products ("Citizen Petition") at 13-15 (available at https://assets-global.website-files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf) (last accessed Nov. 18, 2022).

**JURISDICTION AND VENUE**

6.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because at least one Class member is of diverse citizenship from Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

7.     The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the privilege of conducting business activities in the state of Illinois. Defendant has marketed, promoted, distributed, and sold the Products in Illinois, and Defendant has sufficient minimum contacts with this state and/or sufficiently availed itself of the markets in this state through promotion, sales, distribution and marketing to render the exercise of jurisdiction by this Court permissible.

8.     Venue is proper in this District, pursuant to 28 U.S.C. §1391, because a substantial part of the acts or omissions giving rise to the claims brought herein occurred or emanated within this District, Defendant has marketed, advertised, and sold the Products in this District, and Defendant has caused harm to Plaintiffs and other class members who reside in this District.

**PARTIES**

9.     At all relevant times, Plaintiff Magdalena Bojko (for purposes of this paragraph, "Plaintiff") was a citizen and resident of Schaumburg, Illinois. Plaintiff has purchased for household use Defendant's dry shampoo Products from Ulta, both online and in retail stores in Schaumburg and/or Norridge, Illinois. Plaintiff purchased Klorane Oil-Control Dry Shampoo with Nettle in August 2021 from Ulta.com. She has spent at least $45.00 on Defendant's Products. Based on the false and misleading claims by Defendant, at the time of purchase, Plaintiff was unaware that Defendant's Products were adulterated with benzene. Plaintiff purchased Defendant's Products on the assumption that the labeling of Defendant's Products was accurate

and that the products were unadulterated, safe, and effective. Plaintiff would not have purchased Defendant's Products had she known they contained benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase Products she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

10. At all relevant times, Plaintiff Courtney Heeren (for purposes of this paragraph, "Plaintiff") was a citizen and resident of Village of Lakewood, Illinois. Plaintiff has purchased for household use Defendant's dry shampoo Products from Birchbox.com, including Klorane Dry Shampoo with Oat Milk in May 2022. She has spent at least $40.00 on Defendant's Products. Based on the false and misleading claims by Defendant, at the time of purchase, Plaintiff was unaware that Defendant's Products were adulterated with benzene. Plaintiff purchased Defendant's Products on the assumption that the labeling of Defendant's Products was accurate and that the products were unadulterated, safe, and effective. Plaintiff would not have purchased Defendant's Products had she known they contained benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase Products she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

11. Defendant is a Delaware corporation with its principal place of business located in Parsippany, New Jersey. Defendant is a subsidiary of the Pierre Fabre Group, also known as Laboratories Pierre Fabre, a French multinational pharmaceutical and cosmetics company.

**FACTUAL ALLEGATIONS**

*Defendant's History in the Industry*

12.     In 1965, Pierre Fabre Group acquired Klorane, a small company specializing in the manufacture of botanically-based personal care products.[3] In 1971, Klorane developed the first dry shampoo on the market, designed as a product for new mothers in hospitals.[4]

13.     Dry shampoos, including the Products, are typically administered from an aerosol can and made with a base of alcohol and starch. When applied to the hair, the dry shampoo soaks up the oil and grease, making it look cleaner.[5] According to the Klorane website, the Products are applied by spraying them into the hair, focusing at the roots, and then removing the powder with a brush or by hand.[6]

14.     With more than four decades of history selling dry shampoo to the public, Defendant has gained the trust of consumers who believe the Products are safe for use.

15.     Today, Klorane is the #1 hair care brand in European pharmacies and has gained significant popularity in the United States.

16.     Upon information and belief, Defendant manufactures, markets, advertises, labels, distributes, and sells the Products throughout the United States.[7] The Products are sold in stores and online at retailers including Ulta, Bluemercury, and Amazon.

17.     Dry shampoo products are considered cosmetics that are regulated by the FDA.[8]

---

[3] https://www.kloraneusa.com/our-history (last accessed Nov. 28, 2022).

[4] *See id.*
[5] https://www.webmd.com/beauty/what-is-dry-shampoo (last accessed Nov. 28, 2022).
[6] https://www.kloraneusa.com/dry-shampoo/dry-shampoo-with-oat-milk#939=1569 (last accessed Nov. 28, 2022).
[7] *See id.*
[8] Citizen Petition at 1.

*Benzene Is a Known Human Carcinogen*

18. Scientists, health officials, and governmental regulatory agencies universally agree that benzene poses a significant risk to human health.

19. According to the National Toxicology Program ("NTP"), benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[9] Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC").[10] Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[11] IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma."[12]

20. As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on sufficient evidence of carcinogenicity in humans, sufficient evidence of carcinogenicity in experimental animals, and strong mechanistic evidence. . . . In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[13]

---

[9] Benzene, Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf. (emphasis in original).

[10] Benzene, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018), https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a09 4f45da6d27cc.pdf.

[11] *Id.*

[12] *Benzene and Cancer Risk*, American Cancer Society (last updated Jan. 5, 2016) https://www.cancer.org/cancer/cancer-causes/benzene.html.

[13] *Id.* (emphasis in original).

21.     The Centers for Disease Control and Prevention ("CDC") states that the Department of Health and Human Services has determined that benzene causes cancer in humans.[14] The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[15]

22.     The FDA currently recognizes the high danger of this compound and lists it as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity. . .  However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million ("ppm").[16]

23.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[17]

24.     The Environmental Protection Agency ("EPA") has estimated that lifetime exposure to benzene inhalation at 0.4 parts per billion ("ppb"), or 0.0004 ppm, will increase the

---

[14] Citizen Petition at 1 (citing Centers for Disease Control and Prevention, Facts About Benzene (2018) (https://emergency.cdc.gov/agent/benzene/basics/facts.asp)).
[15] *Facts About Benzene*, *supra*.
[16] *Id.* (citing Food and Drug Administration, Q3C – Tables and List Guidance for Industry (2018) (https://www.fda.gov/media/133650/download)).
[17] *Id.* at 2 (citing 4 Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health (NIOSH), Benzene (October 30, 2019). (https://www.cdc.gov/niosh/npg/npgd0049.html); Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health, BENZENE: Systemic Agent (2011) (https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750032.html)).

risk of developing cancer in humans at the same 1 in 100,000 exposed persons rate as FDA uses to set regulatory limits on other trace impurities like N-nitrosamines.[18]

25.     The World Health Organization has classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[19]

26.     The Department of Health and Human Services has determined that benzene causes cancer in humans.[20]

27.     Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[21]

28.     The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[22]

***Benzene Is Primarily Used in Industrial Processes and Is Highly Regulated***

29.     The CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[23]

---

[18] *Id.* (citing Environmental Protection Agency. Benzene; CASRN 71-43-2. (https://iris.epa.gov/static/pdfs/0276_summary.pdf); Food and Drug Administration (February 2021). Control of Nitrosamine Impurities in Human Drugs. (https://www.fda.gov/media/141720/download).

[19] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/list-of-classifications (last updated July 1, 2022).

[20] *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[21] *Id.*

[22] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last updated Oct. 30, 2019).

[23] *Id.*

30. Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[24]

31. The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[25]

32. Where the use of benzene or other Class 1 solvents is unavoidable, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 ppm.[26]

***Exposure to Benzene in Any Amount is Extremely Dangerous***

33. A 1939 study on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe."[27]

34. A 2010 study summarized the epidemiological studies of the carcinogenic effects of benzene exposure and provided an overview of the hematotoxic effects of benzene.[28] The study concluded:

a. There is probably *no safe level* of exposure to benzene, and *all exposures* constitute some risk in a linear, if not supralinear, and additive fashion.

b. Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

---

[24] *Benzene*, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last updated Jan. 14, 2019).
[25] *See* Citizen Petition at 3-4.
[26] *Id.*
[27] F.T. Hunter, *Chronic Exposure to Benzene (Benzol): The Clinical Effects*, 21 J. Indus. Hygiene & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388.
[28] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANN. REV. PUB. HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

     c.   Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

35.    The CDC has stated that ways in which people "could be exposed to benzene" include[29]:

     a.   Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

     b.   Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

     c.   The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

     d.   Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

     e.   People working in industries that make or use benzene may be exposed to the highest levels of it.

     f.   A major source of benzene exposure is tobacco smoke.

36.    The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[30]

37.    "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[31]

---

[29] *Facts About Benzene*, *supra*.
[30] *NIOSH Pocket Guide*, *supra*.
[31] *Facts About Benzene*, *supra*.

38.     Benzene exposure from dry shampoo is especially troubling because the Product is applied to the scalp and around the face, with the remnants flying through the air, likely to be at least partially inhaled by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

39.     In fact, inhaling benzene at levels of 0.4 ppb frequently over a lifetime might cause an additional cancer per 100,000 people.[32]

40.     The FDA allows for up to 2 ppm of benzene in products where the use of benzene is "unavoidable" to produce a drug product with a significant therapeutic advance. However, dry shampoos are not drugs and contain no active pharmaceutical ingredient for therapeutic purpose; therefore, any significant detection of benzene in the Products could be deemed unacceptable.[33]

***Discovery of Benzene in the Products***

41.     Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products containing said harmful chemicals from reaching consumers. Valisure, an "independent laboratory,"[34] is a company with a core mission "to help ensure the safety, quality and consistency of medications and supplements in the market."[35]

42.     In terms of accreditation and registration, "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238),"[36] and it is

---

[32] https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf (last accessed Nov. 28, 2022)
[33] *See* Citizen Petition, *supra.*
[34] "About Us." https://www.valisure.com/about (last visited Nov. 28, 2022).
[35] Citizen Petition, *supra.*
[36] *Id.*

registered with the Drug Enforcement Administration (License # RV0484814) and FDA (FEI #: 3012063246)."[37]

43.     Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine in ranitidine and metformin, as well as benzene in hand sanitizers and sun care products. Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by the industry and led to recalls by manufacturers over the subject products.

44.     On October 31, 2022, Valisure petitioned the FDA to address dangerous levels on benzene in dry shampoos based upon rigorous testing the organization had conducted on a number of dry shampoo products.[38]

45.     In conjunction with its petition, Valisure reported its testing results for benzene in various types of dry shampoo. The testing utilized gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation.[39]

46.     GC-MS "is generally considered one of the most accurate analyses available."[40] Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[41]

47.     "The GC-MS method described in this petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid

---

[37] *Id.*
[38] *See id.*
[39] *Id.*
[40] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (last visited July 20, 2022).
[41] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.

pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[42]

48.    Valisure analyzed 148 unique batches from 34 brands of dry shampoo.[43]

49.    Valisure identified ten brands of dry shampoo which contained levels of benzene at 2 ppm or higher, including the Products at issue in this case.[44]

50.    Valisure specifically measured benzene concentrations from 0.20 to 5.72 ppm in the Products:[45]

| Product Description | UPC | Lot | Benzene Concentration (ppm) |
|---|---|---|---|
| Dry Shampoo with Oat Milk Ultra Gentle | 3282770200874 | FR4002 | 5.72 |
| Dry Shampoo with Nettle Oil Control | 3282770208702 | FR709 | 3.07 |
| Dry Shampoo with Oat Milk Ultra Gentle | 328770200850 | FR330 | 1.89 |
| Dry Shampoo with Oat Milk Ultra Gentle | 3282770200898 | FR4015 | 0.2 |

51.    In its Citizen Petition, Valisure shows data from the analysis of benzene by directly sampling contaminated air after spraying dry shampoo products, which suggests potential for short- and long-term inhalation exposure to high levels of benzene.[46] The presence of this known

---

[42] Citizen Petition, *supra*.
[43] *Id.*
[44] *Id.*
[45] Citizen Petition, *supra*.
[46] *Id.* at 2.

human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling.[47]

52.     In some of the lots tested, the detected levels of benzene in the Products are greater than the 2 ppm concentration limit for "unavoidable" uses per FDA guidance.[48]  However, because benzene is not a requisite component of manufacturing or packaging dry shampoo, its presence in the Products is not unavoidable and "any significant detection of benzene should be deemed unacceptable."[49]

53.     The Products are not designed to contain benzene, and no amount of benzene is acceptable in dry shampoo such as the Products manufactured, distributed, and sold by Defendant. Further, although Defendant lists the ingredients on the Products' labels, Defendant failed to disclose on the Products' labeling or anywhere in Defendant's marketing that the Products contain benzene.[50]

54.     Despite its knowledge that the Products contain benzene, Defendant has failed to issue a voluntary recall of the Products.

***Benzene Renders the Product Adulterated, Misbranded, and Illegal to Sell***

55.     As previously stated, the subject Products are considered cosmetics, which the FDCA defines by their intended use, as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body . . . for cleansing, beautifying, promoting attractiveness, or altering the appearance[.]" Federal Food, Drug, and Cosmetic Act

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] Picture available on authorized retailer Walmart's website. *See* https://www.walmart.com/ip/Batiste-Dry-Shampoo-Bare-Fragrance-4-23-OZ-Packaging-May-Vary/141628758?athbdg=L1100 (last accessed Nov. 7, 2022)

§ 201(i). "Cosmetic companies have a legal responsibility for the safety of their products and ingredients."[51]

56.    The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of cosmetic products.[52]

57.    As cosmetic products regulated by the FDA, the Products are prohibited from being adulterated or misbranded. *See* FD&C Act, 21 U.S.C. §§ 361, 362.

58.    A cosmetic is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual..." 21 U.S.C. § 361(a).

59.    A cosmetic shall be deemed to be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 362 (a).

60.    FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[53]

61.    In cosmetic products, the FDA has announced recalls of various products contaminated with benzene, including other dry shampoos.[54]

---

[51] Cosmetic Safety Q&A: Personal Care Products (https://www.fda.gov/cosmetics/resources-consumers-cosmetics/cosmetics-safety-qa-personal-care-products#:~:text=Cosmetic%20companies%20have%20a%20legal,product%20affects%20how%20you%20look).

[52] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).

[53] Citizen Petition, *supra*.

[54] Food and Drug Administration. *P&G Issues Voluntary Recall of Aerosol Dry Conditioner Spray Products and Aerosol Dry Shampoo Spray Products* (Dec. 17, 2021) (https://www.fda.gov/safety/recalls-market- withdrawals-safety-alerts/pg-issues-voluntary-recall-aerosol-dry-conditioner-spray-products-and-aerosol-dry- shampoo-spray)

62.     Moreover, because dry shampoos are cosmetics and not drugs, they contain no active pharmaceutical ingredient for therapeutic purpose which might create an exception to the presence of benzene.

63.     Regardless, Defendant's Products contain levels of benzene above 2 ppm, including, in some cases, nearly 3 times that limit.[55]

64.     Defendant could have avoided any potential for benzene contamination in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with absolutely no benzene in them.

65.     The mere presence of benzene renders the Products both adulterated and misbranded under the FDCA. The Products are adulterated because they "contains [a] poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof." 21 U.S.C. § 361(a).

66.     The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 362(a).

67.     A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

68.     The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/18 is exactly the same as the FD&C Act.

69.     As alleged herein, Defendant has violated the FDCA, the IL FDCA, and the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"). Defendant engaged in fraudulent,

---

[55] Citizen Petition, *supra*.

unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding benzene contamination affecting the Products.

70.     Defendant's failure to control for benzene contamination and minimized notification of the importance and risks of benzene in its adulterated Products constitutes unfair and deceptive conduct. If Defendant had disclosed to Plaintiffs and putative Class Members that the Products contained or risked containing benzene and thus risked users to benzene exposure, Plaintiffs and putative Class Members would not have purchased the Products or they would have paid less for the Products.

71.     Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain the known human carcinogen, benzene, and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

72.     Plaintiffs and Class members bargained for a dry shampoo free of contaminants and dangerous substances and were deprived the basis of their bargain when Defendant sold them a product containing the carcinogen benzene, which rendered the Products unmerchantable and unfit for use.

73.     As the Products expose consumers to benzene, sometimes well above the legal limit for drugs (which the Products are not), the Products are not fit for use by humans.

74.     Plaintiffs are thus entitled to damages related to Defendants' conduct and injunctive relief.

75.     The manufacture of any misbranded or adulterated cosmetic is prohibited under federal law[56] and Illinois state law.[57]

76.     The introduction into commerce of any misbranded or adulterated cosmetic is similarly prohibited.[58]

77.     The receipt in interstate commerce of any adulterated or misbranded cosmetic is also unlawful.[59]

78.     Among the ways a cosmetic may be adulterated are, "[i]f it consists in whole or in part of any filthy, putrid, or decomposed substance; or . . . whereby it may have been rendered injurious to health[.]"[60]

79.     A cosmetic is misbranded "[i]f its labeling is false or misleading in any particular."[61]

80.     Defendant did not disclose that benzene, a known human carcinogen, is present in the Products purchased by Plaintiffs and the putative class members. As a result of benzene contamination in the Products, they are considered adulterated and misbranded. The FDA instructs that there is no safe level of benzene, and thus it "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."[62]

---

[56] 21 U.S.C § 331(g).

[57] *See* 410 ILCS 620/3 (incorporating 410 ILCS 620/3.1, 410 ILCS 620/3.2, and 410 ILCS 620/3.3).

[58] 21 U.S.C. §331(a); *see also* 410 ILCS 620/3 (incorporating 410 ILCS 620/3.1, 410 ILCS 620/3.2, and 410 ILCS 620/3.3).

[59] 21 U.S.C. §331(c); *see also* 410 ILCS 620/3 (incorporating 410 ILCS 620/3.1, 410 ILCS 620/3.2, and 410 ILCS 620/3.3).

[60] 21 U.S.C §351(a)(1); *see also see also* 410 ILCS 620/18.

[61] 21 U.S.C. §352(a)(1); *see also see also* 410 ILCS 620/19.

[62] FDA, Q3C–2017 Tables and List Guidance for Industry (dated June 2017, available at: https://www.fda.gov/media/71737/download, last viewed on Dec. 13, 2021).

81. As a seller of a cosmetic, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before injecting the Products into the stream of commerce for consumers to use on their hair and scalp. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene, despite its claims that the Products' ingredients were tested for safety. Nor did it disclose to Plaintiffs in any advertising or marketing that its dry shampoo contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

82. Plaintiffs have standing to represent members of the putative class because there is sufficient similarity between the specific Products purchased by Plaintiffs and the other Products not purchased by Plaintiffs. Specifically, each and every one of Defendant's Products (i) are marketed in substantially the same way—as dry shampoo— and (ii) fail to include labeling indicating to consumers that the Products contain the known human carcinogen, benzene, at levels that are dangerous to human health when used as directed. Accordingly, the misleading effect of all of the Products' labels are substantially the same.

83. Had Plaintiffs and members of the putative class known that any of the Products were contaminated with benzene, a known human carcinogen, they would not have purchased any of Defendant's Products. Thus, Plaintiffs and members of the putative class have "lost money" by purchasing products they would not have otherwise purchased but for Defendant's misrepresentations and omissions. By failing to disclose the presence of benzene in its Products,

Plaintiffs and members of the putative class have been injured. As a result, Plaintiffs and members of the putative class have Article III standing.

***Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers***

84.     The Products contain butane, isobutane, and propane as propellants.

85.     Aerosols typically contain volatile hydrocarbons, like butane or isobutane, as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

86.     Because the chemicals are derived from the same sources in the same facilities, there is high potential for benzene contamination in the processing of butane and isobutane.

87.     Manufacturing companies that work with these volatile chemicals understand the risks of benzene contamination.[63]

88.     Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as butane and isobutane, knew or should have known of the risks of benzene contamination.

89.     Defendant's use of butane and isobutane as a propellant therefore put them on notice of the risk of benzene contamination in the Products.

90.     Defendant sold, and continue to sell, dry shampoo products containing butane and isobutane during the class period despite Defendant's knowledge of the risk of benzene contamination.

---

[63] *See, e.g., Butane Safety Data Sheet*, Whiting, https://whiting.com/wp-content/uploads/Butane-SDS.pdf (last updated Oct. 30, 2013) ("MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS.").

91.     Federal and state regulatory regimes require that cosmetics marketed on a retail basis to consumers contain a list of ingredients.[64] Failure to comply with this requirement renders a cosmetic misbranded under the FD&C Act and analogous state regulatory acts, including the IL FDCA.

92.     Benzene is not listed on the Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.

93.     Defendant has engaged in deceptive, untrue, and misleading advertising by making representations by failing to warn about the potential presence of benzene in the Products, and nothing on the Products' labels otherwise insinuate, state, or warn that the Products contain benzene.

94.     The presence of benzene in the Products renders the Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiffs would not have purchased the Products had they been truthfully and accurately labeled.

95.     Had Defendant adequately tested its Products for benzene and other carcinogens and impurities, it would have discovered that its Products contained benzene – even at levels above the FDA's limit (to the extent even applicable), making the Products illegal to distribute, market, and sell.

96.     Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[65]

---

[64] *See* 21 C.F.R. § 701.3.
[65] https://monographs.iarc.who.int/list-of-classifications (last accessed Nov. 7, 2022)

97. Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced a contaminated, adulterated, and misbranded Products containing or risked containing dangerous amounts of benzene into the U.S. market.

98. By marketing and selling its hair spray products in the stream of commerce with the intent that its Products would be purchased by Plaintiffs and Class Members, Defendant warrants that the Products are safe to use rather than adulterated hair sprays containing a dangerous, cancer-causing chemical.

99. Defendant did not disclose the actual or potential presence of benzene in its dry shampoo products on the Products' labeling, advertising, marketing, or sale of the Products.

100. Defendant wrongfully advertised and sold the Products without any labeling to indicate to consumers that these products contain benzene. The following images are illustrative of the labels[66] contained on the Products purchased by Plaintiffs and the class members, none of which contain any warnings or mention of the presence of a carcinogenic ingredient:

---

[66] *See* https://www.redken.com/products/styling/dry-shampoos/deep-clean-dry-shampoo (last visited Nov. 18, 2022).



101.     Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers

such as Plaintiffs and Class members make purchasing decisions based on the representations made on the Products' labeling, including the ingredients listed.

102. Defendant knows that if it had not omitted that the Products contained benzene, then Plaintiffs and Class members would not have purchased the Products.

***Injuries to Plaintiffs and Class Members***

103. When Plaintiffs purchased Defendant's Products, Plaintiffs did not know, and had no reason to know, that Defendant's Products contained or risked containing the harmful carcinogen benzene. Not only would Plaintiffs not have purchased Defendant's Products had they known the Products contained benzene, but they would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens and impurities.

104. Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must rely on Defendant to truthfully and honestly report what the Products contain on the Products' packaging or labels.

105. Further, given Defendant's position as a leader in the hair care industry and one of the top sellers of dry shampoo worldwide, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

106. Yet, when consumers look at the Products' packaging, there is no mention of benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products. This leads reasonable consumers to believe the Products do not contain benzene. Indeed, these expectations are reasonable because if the Products are manufactured properly, benzene will not be present in the Products.

107.    No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (which do not even apply to Defendant's Products).

108.    Thus, if Plaintiffs and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

109.    Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class Members.

110.    Plaintiffs and Class members bargained for a dry shampoo product free of contaminants and dangerous substances. Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene—or at risk of containing the same—and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

111.    As alleged above, Plaintiffs and Class members' Products either contained benzene or were at significant risk of containing the same.

112.    Plaintiffs and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## CLASS ALLEGATIONS

113.    Plaintiffs bring this action pursuant to Rule 23(a), 23(b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the

following class (the "Class"), Illinois Subclass, and Consumer Fraud Multi-State Subclass

(collectively referred to as the "Classes") defined as:

**Class:**

All persons in the United States (including its Territories and the District of
Columbia) who purchased any Products for personal or household use.

**Illinois Subclass:**

All persons in the state of Illinois who purchased any Products for personal or
household use.

**Consumer Fraud Multi-State Subclass:**

All persons who purchased one or more of Defendant's Products in the states of
California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New
Jersey, New York, or Washington for personal or household use within any
applicable limitations period.[67]

114.    Subject to additional information obtained through further investigation and

discovery, the foregoing definition of the Classes may be expanded or narrowed by amendment or

amended complaint. Specifically excluded from the proposed Classes are Defendant, its officers,

directors, agents, trustees, parents, children, corporations, trusts, representatives, employees,

principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs,

successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their

officers and/or directors, or any of them; the Judge assigned to this action, and any member of the

Judge's immediate family.

---

[67] While discovery may alter the following, the states in the Consumer Fraud Multi-State
Subclass are limited to those states with similar consumer fraud laws under the facts of this case:
California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*);
Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*);
Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*);
Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York
(N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code
§ 19.86.010, *et seq.*).

115. Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

116. ***Numerosity.*** Rule 23(a)(1) of the Federal Rules of Civil Procedure: The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe, and on that basis alleges, that the proposed Classes contain many tens or hundreds of thousands of members. The precise number of Class members is unknown to Plaintiffs at this time.

117. ***Commonality and Predominance.*** Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

      a.    Whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

      b.    Whether Defendant's conduct was unfair and/or deceptive;

      c.    Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Class;

      d.    Whether Defendant breached an express warranty;

      e.    Whether Defendant breached an implied warranty;

      f.    Whether Plaintiffs and the Class have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages; and

g.     Whether an injunction is necessary to prevent Defendant from continuing to market and sell defective and adulterated Products that contain benzene, a known human carcinogen.

118.    **Typicality.**   Rule 23(a)(3) of the Federal Rules of Civil Procedure:  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendant's uniform misconduct described above and were subject to Defendant's deceptive claims that accompanied each and every Product in Defendant's collection. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all putative Class members.

119.    **Adequacy**.  Rule 23(a)(4) of the Federal Rules of Civil Procedure:  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

120.    **Declaratory Relief.**   Rule 23(b)(2) of the Federal Rules of Civil Procedure: Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to the Classes as a whole.

121.    Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell Products that are adulterated with benzene, and requiring Defendant to provide a full refund of the purchase price of the Products to Plaintiffs and Class members.

122.     Unless a class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiffs and the Class members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

123.     *Superiority*.  Rule 23(b)(3) of the Federal Rules of Civil Procedure:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS 501/1, et seq. and 510/2)**
**On Behalf of the Illinois Subclass**

124.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125.     Plaintiffs bring this claim on behalf of themselves and the Illinois Subclass members against Defendant.

126.    Defendant, Plaintiffs, and the Illinois Subclass are "persons" within the meaning of 815 ILCS 505/1(c) and 510/1(5). Plaintiffs and the Illinois Subclass members are "consumers" within the meaning of 815 ILCS 505/1(e).

127.    At all times mentioned herein, Defendant engaged in "trade" or "commerce" in Illinois as defined by 815 ILCS 505/1(f), in that it engaged in the "advertising," "offering for sale," "sale," and "distribution" of any "property," "article," "commodity" or "thing of value" in Illinois.

128.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("IFCA") provides that ". . . [u]nfair or or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act'… in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."   815 ILCS 505/2. The ICFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

129.    For the reasons discussed herein, Defendant violated and continues to violate ICFA by engaging in the deceptive or unfair acts or practices prohibited by 815 ILCS 505/2 and 510/2. Defendant's acts and practices, including its material omissions, described herein, were intended to, likely to, and did in fact, deceive and mislead members of the public, including consumers acting and relying reasonably under the circumstances, to their detriment.

130.    Defendant repeatedly advertised on the labels for the Products, on its websites, and through national advertising campaigns, among other items, that the Products were and are safe, suitable, and fit for their intended purpose, use, and purpose. Defendant failed to disclose the

material information that the Products contained or materially risked containing carcinogenic benzene.

131.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained or materially risked containing carcinogenic benzene.

132.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiffs and the Illinois Subclass members suffered damages by purchasing the Products in reliance on Defendant's statements because they would not have purchased the Products had they known the truth, and they received a product that was worthless, and/or worth less, because it contains or materially risks containing carcinogenic benzene.

133.    Defendant's unlawful conduct is continuing, with no indication of Defendant's intent to cease this fraudulent course of conduct, posing a threat of future harm to Plaintiffs, the Illinois Subclass, and the general public. Thus, Defendant's unlawful acts and practices complained of herein affect the public interest.

134.    Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiffs and the Illinois Subclass seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the ICFA.

<u>**COUNT II**</u>
**Violations of State Consumer Fraud Acts**
**(On behalf of Plaintiffs and the Consumer Fraud Multi-State Subclass)**

135.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

136.    Plaintiffs bring this Count on behalf of themselves and the Consumer Fraud Multi-State Subclass against Defendant.

137.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

138.    Plaintiffs and the other Members of the Consumer Fraud Multi-State Subclass have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiffs and Members of the Consumer Fraud Multi-State Subclass have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

139.    Defendant engaged in unfair and/or deceptive conduct, including, but not limited to, selling adulterated and/or misbranded cosmetics in violation of the FDCA.

140.    Defendant also engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the presence of benzene in the Products, as discussed herein.

141.    Defendant intended that Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Subclass would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

142.    Given Defendant's position in the health and beauty market as an industry leader, Plaintiffs and reasonable consumers, trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

143.    As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Subclass have sustained damages in an amount to be proven at trial.

144.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT III
### Breach of Express Warranty
### (On Behalf of the Class, or Alternatively, the Illinois Subclass)

145.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146.     Plaintiffs bring this claim on behalf of themselves and the Classes against Defendant.

147.     Plaintiffs and each Class member purchased Defendant's Products from common retail settings. There was no learned intermediary between the manufacturer and the end-purchaser at the time of purchase and the express warranties were on the Products' packaging, labeling, and via direct-to-consumer advertising.

148.     Plaintiffs and each Class member formed a contract with Defendant at the time Plaintiffs and the other Class members purchased Defendant's Products. The terms of the contract include the promises and affirmations and omissions of fact made by Defendant on its Product packaging, labeling, and through marketing and advertising. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract that Defendant entered into with Plaintiffs and each Class member.

149.     Defendant expressly warranted that its Products were fit for their ordinary use (i.e., as a safe product suitable for human application) by, for example, instructing consumers that the Products should be "spray[ed] evenly" on the hair, "focusing at the roots," and "le[ft] on for 2

minutes" before being brushed."[68] Defendant also stated that the Products are "[s]uitable for even the most sensitive scalp."[69]

150.     Plaintiffs and each Class member read and relied on one or more of the express warranties provided by Defendant in the labeling, packaging, and written advertisements in deciding to purchase the Products.

151.     Defendant's Products did not conform to Defendant's express representations and warranties because they were not manufactured in compliance applicable standards, were not suitable for human application, and were adulterated and misbranded.

152.     At all times relevant all the following States and Territories have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. Code. § 2-313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. § 26-1- 2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2- 313; Mont. Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382- A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, et seq.; R.I. Gen.

---

[68] https://www.kloraneusa.com/dry-shampoo/dry-shampoo-with-oat-milk#939=1569 (last visited Nov. 22, 2022).
[69] *Id.*

Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A2-313; Va. Code § 8.2- 313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313 and Wyo. Stat. § 34.1-2-313.

153.     At the time that Defendant marketed and sold its Products, it recognized the purposes for which the products would be used, and expressly warranted the products were suitable for human application and not adulterated or misbranded. These affirmative representations became part of the basis of the bargain in every purchase by Plaintiffs and each Class member.

154.     Plaintiffs and each Class member are natural persons who are reasonably expected to use, consume, or be affected by the adulterated and/or misbranded Products manufactured and sold by Defendant.

155.     Defendant breached its express warranties with respect to its Products because the products were not suitable for human application because they were adulterated with benzene and misbranded.

156.     Plaintiffs and each Class member would not have purchased the Products had they known the products contained benzene, were not suitable for human application, did not comply with applicable standards, and/or were adulterated and misbranded.

157.     As a direct and proximate result of Defendant's breach of express warranty, Plaintiffs and other Class members have been injured and suffered damages in the amount of the purchase price of their Products, and any consequential damages resulting from the purchases, in that the Products they purchased were so inherently flawed, unfit, or unmerchantable as to have no market value.

<u>COUNT IV</u>
**Breach of the Implied Warranty**
**(On Behalf of the Class, or Alternatively, the Illinois Subclass)**

158. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

159. Plaintiffs bring this claim on behalf of themselves and the Classes against Defendant.

160. Defendant was at all relevant times the manufacturer, distributor, warrantor and/or seller of the Products. Defendant knew or had reason to know of the specific use for which its Products were purchased. At the time Defendant marketed and otherwise placed its Products into the stream of commerce, it knew of the particular purpose for which Plaintiffs and the Class members purchased the Products—to have a safe and effective dry shampoo—which did not contain any dangerous carcinogens. Defendant also knew that consumers, including Plaintiffs and members of the Class, would have no ability or opportunity to determine the ingredients in the Products, but instead would rely on Defendant's representations that the Products were suitable for their particular purpose and free of dangerous carcinogens (i.e., benzene).

161. The implied warranty of merchantability included with the sale of each Product means that Defendant guaranteed that the Products would be fit for the ordinary purposes for which dry shampoos are used and sold, and were not otherwise injurious to consumers. The implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendant, and Plaintiffs and Class Members.

162. Because the Products contain benzene, they were not of the same quality as those generally acceptable in the trade and were not fit for the ordinary purposes for which such Products are used. Defendant thus breached the implied warranty of merchantability.

163. The Products were not altered by Plaintiffs or members of the Class.

164. Plaintiffs and members of the Class were foreseeable users of the Products.

165. Plaintiffs and members of the Class used the Products in the manner intended.

166. Further, as the intended consumers and ultimate users of the Products, Plaintiffs and the Class members are intended third-party beneficiaries of any contracts between Defendant and any retailers from whom Plaintiffs obtained Products, which contain the implied warranty of merchantability and to be fit for ordinary purposes, safe, and not hazardous to one's health. Plaintiffs and the Class members, not any retailers, are the parties intended to benefit by any such contract because they are the people using the Products in the manner intended.

167. As a direct and proximate result of Defendant's breach, Plaintiffs and the Class members have suffered, and will continue to suffer, significant damages, loss and injury in an amount that will be established at trial.

## COUNT V
### Unjust Enrichment
### (On Behalf of the Class, or Alternatively, the Illinois Subclass)

168. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

169. Plaintiffs bring this claim on behalf of themselves and the Classes against Defendant.

170. Plaintiffs, and the other members of the Class, conferred benefits on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

171. Defendant voluntarily accepted and retained this benefit.

172.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

173.    Defendant received benefits in the form of revenues from purchases of the Products to the detriment of Plaintiffs, and the other members of the Class, because Plaintiffs, and members of the Class, purchased mislabeled products that were not what they bargained for and were not safe and effective, as claimed.

174.    Defendant was unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiffs and the other members of the Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs, and members of the Class, because they would have not purchased the Products had they known the true facts.

175.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

176.    Finally, Plaintiffs and members of the Class may assert an unjust enrichment claim even though a remedy at law may otherwise exist.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Classes alleged herein, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Classes and Plaintiffs' attorneys as Class Counsel;

B.      For an order declaring the Defendant's conduct violates the causes of action referenced herein;

C.      For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and

H.      For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiffs and Class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), of all issues so triable.

Dated: December 1, 2022.                    Respectfully submitted,

                                            */s/ Gary M. Klinger*
                                            Gary Klinger
                                            **MILBERG COLEMAN BRYSON
                                            PHILLIPS GROSSMAN PLLC**
                                            227 W. Monroe Street, Suite 2100
                                            Chicago, IL 60606
                                            Tel.: (866) 252-0878
                                            gklinger@milberg.com

                                            Nick Suciu III
                                            **MILBERG COLEMAN BRYSON
                                            PHILLIPS GROSSMAN, PLLC**
                                            6905 Telegraph Rd., Suite 115
                                            Bloomfield Hills, MI 48301
                                            Tel.:(313) 303-3472 / Fax:(865) 522-0049
                                            nsuciu@milberg.com

Erin J. Ruben
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
900 W. Morgan St.
Raleigh, NC 27605
Tel.: (919) 600-5009
eruben@milberg.com

Alex Honeycutt
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.: (865) 247-0080
ahoneycutt@milberg.com

Jeff Ostrow*
Kristen Lake Cardoso*
**KOPELOWITZ OSTROW FERGUSON**
**WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email: ostrow@kolawyers.com
        cardoso@kolawyers.com

Max S. Roberts
**BURSOR & FISHER, P.A.**
888 Seventh Avenue New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: mroberts@bursor.com

Sarah N. Westcot*
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131 Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com

*Attorneys for Plaintiffs and the Putative*
*Classes*

*\*Pro hac vice* forthcoming